**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

**v.**

**CHRISTOPHER GUTIERREZ**

**Defendant**

**Case No. 1:24-cr-0184 (LLA)**

**DEFENDANT'S SENTENCING MEMORANDUM**

On August 21, 2024, Christopher Gutierrez will appear before this Court for sentencing, having pled guilty plea to one violation of 40 U.S.C. § 5104(e)(2)(D), and one violation of 40 U.S.C. § 5104(e)(2)(G), Class B Misdemeanors, for his actions on January 6, 2021. Mr. Gutierrez, by and through his attorney, Assistant Federal Defender Kara Ottervanger, hereby submits this memorandum in aid of sentencing. Mr. Gutierrez is asking that the Court sentence him to a period of 12 months of probation, a fine of $1500, and $500 restitution. The requested sentence is "sufficient, but not greater than necessary" to meet the objectives of 18 U.S.C. § 3553(a), and accounts for both the aggravating and mitigating circumstances of Mr. Gutierrez's conduct, his lack of a prior criminal record, as well as his employment and educational history.

## I. Procedural History

On September 27, 2023, Mr. Gutierrez was arrested at his place of employment in Mono Hot Springs, California, pursuant to a criminal complaint. The following day, Mr. Gutierrez appeared via video at an out-of-district initial appearance in the Eastern District of California before the Honorable Stanley A. Boone; he was released with pretrial conditions. [EDCA Case

No. 1:23-mj-0114-SAB]. On October 5, 2023, Mr. Gutierrez made an initial appearance via video in the District of Columbia before the Honorable Judge Moxila A. Upadhyaya; he remained on pretrial release.

A two-count information was filed on April 12, 2024, charging Mr. Gutierrez with Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count One); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Two). [Doc. 23].

**II. The Plea Agreement**

On April 29, 2024, Mr. Gutierrez pled guilty to both counts of the information pursuant to a plea agreement. [Doc. 27]. In exchange, the Government agreed not to pursue two additional charges from the original criminal complaint. *Id*. Mr. Gutierrez remained out of custody pending sentencing. For his conduct, Mr. Gutierrez faces up to six months in jail, a fine of up to $5,000, or a term of probation for up to five years. 40 U.S.C. § 5109(b); 18 U.S.C. § 3571(b); 18 U.S.C. § 3561(c)(2). He may not receive a sentence that includes both probation and incarceration for the same count. *U.S. v. Little*, 78 F.4th 453 (D.C. Cir. 2023); 18 U.S.C. § 3551(b).

The sentencing guidelines do not apply to a conviction for a Class B Misdemeanor offense. U.S.S.G. § 1B1.9. If the guidelines applied in this case, Mr. Gutierrez would have a Criminal History Category of I, as he does not have any prior criminal history.

**III. Applicable Legal Principles**

Pursuant to § 3553(a), a sentencing court must consider the nature of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, provide just punishment, afford adequate deterrence, protect the public, provide needed treatment, and avoid unwarranted sentencing disparities among

defendants with similar records convicted of similar conduct; and provide restitution. 18 U.S.C. § 3553(a)(1)-(7).

The circumstances of this case highlight the importance of the Court's role "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (internal quotations and citations omitted). Consideration of Mr. Gutierrez's personal characteristics, and all the § 3553(a) factors, supports a sentence of 12 months of probation, a fine of $1500, and $500 restitution. Such a sentence serves the goals of sentencing as it holds Mr. Gutierrez accountable for his conduct, deters similar conduct, and provides him the opportunity to demonstrate his rehabilitation. It is a sentence "sufficient, but not greater than necessary, to accomplish the sentencing goals advanced." *Kimbrough v. United States*, 552 U.S. 85, 111 (2007).

**IV. Mr. Gutierrez's history and characteristics support a term of probation**

Mr. Gutierrez, a 37-year-old man with no criminal history, should be placed on a term of probation. While the nature and circumstances of the January 6 events were indeed serious, his particular actions that day, paired with his individual history and characteristics, do not necessitate a sentence of incarceration. A probationary sentence would provide adequate deterrence to Mr. Gutierrez and avoid an unwarranted sentencing disparity among similarly-placed January 6 defendants. It will also prevent unnecessary interruption to Mr. Gutierrez's employment and permit him to promptly pay any fine and restitution.

Christopher Gutierrez is the epitome of an everyday, hardworking American. He was born and raised in California, one of three boys. His life growing up was average and fulfilling. He was never a top scholar or star athlete, but he and his brothers had fun and built friendships

doing the things they loved to do, such as riding motorbikes. Mr. Gutierrez has always been curious and contemplative.

Mr. Gutierrez's family is large and close knit. His aunt, Sylvia Guzman, describes him as "very family oriented." [*See* Exhibit A, Letter of Sylvia Guzman]. Not only does his family find him "fun to be around," he makes connections with all of those around him. His aunt witnessed him in grade school "interact with classmates, school staff, and teachers" all of whom he got along with. *Id*. She describes him as "soft spoken, easy going, charismatic, and [] funny." Mr. Gutierrez was never in trouble at school and he made lifelong friends. *Id*. He also volunteered with community outreach programs such as the local food kitchen as a teen. *Id*. Mr. Gutierrez is selfless and steps up in times of need. He is handy and does not hesitate to get dirty and do hard work to help out his extended family. *Id*.

Mr. Gutierrez's family all describe him this way. His uncle, Joe Guzman, says that Mr. Gutierrez is a responsible, caring person. [*See* Exhibit B, Letter of Joe Guzman]. Mr. Gutierrez shows up for his people in their time of need, putting them before himself. *Id*. In times of loss and sorrow, Mr. Gutierrez is able to lift up his family and friends. For example, he put aside his own fear of public speaking at his cousin's funeral to give a "heartfelt and moving speech" that had "everyone crying and laughing at the same time." *Id*. Perhaps one of the most meaningful examples of how Mr. Gutierrez cherishes his family and demonstrates "genuine concern" for them is told by his middle brother, Nicholas. When Nicholas was 19, he came out to Mr. Gutierrez as gay, a fact that he had only revealed to their mother at that point. [*See* Exhibit F, Letter of Nicholas Gutierrez]. Nicholas recounts that it was Mr. Gutierrez's "empathy and understanding" that allowed him to "feel safe and ultimately open up to others." *Id*.

Mr. Gutierrez made sure it was clear to Nicholas that he was his brother and would always love him "no matter who [he] chose to bring into [his] life." *Id*.

Mr. Gutierrez has found a way to channel the things he enjoys and excels at into a meaningful career. For seven years he has worked at Vermillion Valley Resort in the high Sierra mountains working in forestry. [Exhibits A, B]. He maintains nearly everything on the property and has even continued to better himself so that he can be more of an asset to the resort. For example, Mr. Gutierrez has completed an EMT course so that he can assist in the event of an emergency, and he plans to attend tractor maintenance school and get certified in heavy duty equipment. [Exhibit A]. Mr. Gutierrez's youngest brother, Eric, has seen Mr. Gutierrez in action at the resort and could see the ways in which he has made the place better by being himself, describing it as "his dream job." [*See* Exhibit C, Letter of Eric Gutierrez]

It is not just his family who can see the effect that Christopher has had on Vermillion Valley Resort. Michael Bransby, the owner, purchased the lodge in 2021 and has hired Mr. Gutierrez to do many jobs. [*See* Exhibit G, Letter of Michael Bransby]. He refers to Mr. Gutierrez as "one of the most capable persons with all different types of tools" and asserts that Mr. Gutierrez has "a high standard to get the job done right without cutting corners." *Id*. Mr. Bransby further describes Mr. Gutierrez as "upfront and direct" and respects him for both his honesty and the way he is able to work through challenges by facing them "head-on and not beating around the bush." *Id*. Mr. Bransby trusts Mr. Gutierrez completely and intends to give him equity in the business, citing him as an "incredible asset." *Id*. Mr. Gutierrez is so dedicated to the resort that he has asked counsel to request that, if he does receive a sentence of

incarceration, he be allowed to serve his time in the resort's off season,[1] so that he does not let down Mr. Bransby, his fellow coworkers, or the resort guests.

Mr. Gutierrez is dependable in every sense of the word. He shows up for his family and his job. On January 6, he thought he was showing up for his country. Since that time, he has come to see that he was wrong. He has "expressed remorse and regret for his participation," but has never made excuses for his actions or sought to blame others. [Exhibit B]. Since returning from Washington D.C. in January 2021, Mr. Gutierrez has refocused on his work and on being of assistance to his friends and family [*See* Exhibit E, Letter of Miguel Gutierrez]. His goals are simple: purchase land in the country, build a home, and start a family [*See* Exhibit D, Letter of Sheila Gutierrez].

Mr. Gutierrez places no blame on anyone else for the choices he made on January 6. He never seeks to blame others for his thoughts, beliefs, or actions. He simply did what he thought was right at the time. Never having been very politically active, he was taken with Donald Trump's[2] populist message to the American people. After the 2020 election, Mr. Gutierrez, like many Americans, watched as Trump conducted televised rallies and posted frequently on Twitter with the message that the election had been stolen and that the nation's very concept of democracy was at stake.

Mr. Gutierrez initially went to the Washington D.C. on January 6 to watch Trump speak at the Ellipse. There, the sitting U.S. President told the crowd to go to the Capitol Building, and that he would meet them there. So, Mr. Gutierrez walked along with the crowd, meeting people and shaking hands along the way. At some point, he was given PVC pipe to use as a pole for the

[1] Weather dependent, off-season typically begins in late October or early November.
[2] Now-former President Donald Trump was the sitting United States President at all relevant times, including January 6, 2021. He will be referred to simply as "Trump" hereinafter for the sake of convenience and conciseness.

flag he brought with him. He ended up with countless others at the Capitol Building. And there, as described below, he got swept up by the moment.

The stories told by Mr. Gutierrez's family demonstrate that he holds no place in his heart for hate or bigotry. His actions on January 6, 2021, while misguided and wrong, were motivated by loyalty—to his country and his President—and by his innate sense of curiosity. It has been over three and a half years since that day, and Mr. Gutierrez has not made another misguided choice like this. Mr. Gutierrez saw that, whether what Trump said about the election was true or not, it was not true that the way to save democracy was to follow a crowd that was taking things into their own hands. Mr. Gutierrez has returned to his life of minding his own business, working hard, and caring for those in his direct orbit. His love for his country remains strong, but he is focusing on realizing his own American dream closer to home.

## V. Offense Conduct

The events of January 6 cannot, and should not, be minimized. When protestors unlawfully assembled on the grounds of the U.S. Capitol Building, and later broke through windows and doors, over 100 law-enforcement officers were injured and the U.S. Capitol Building sustained over an estimated $2.9 million in property damage. Several people lost their lives as a result of the incident. And because of the breach, the 2020 Presidential Electoral College count was delayed. All of these casualties and disruptions exacted a toll on Americans: some lost family members, some lost friends, and some lost confidence in the American political system's ability to defend against threats to the peaceful transfer of power.

As briefly described above, Mr. Gutierrez was a participant in this event. Like many people, Mr. Gutierrez went to watch Trump's speech on January 6 because he came to believe a noxious lie: that the 2020 election was stolen. There was a steady drumbeat of disinformation

leading up to the events that transpired that day, and it continued in Trump's speech at the Ellipse that morning.

Mr. Gutierrez's conduct was comparatively mitigated. Mr. Gutierrez did not participate in any specific violent acts, nor did he commit any acts of vandalism or destruction. He was not physically aggressive and he did not solicit others to be. In the videos that depict him in the Capitol Building, he is not leading the mob into or through the building. He did not arrive at the Capitol Building staircase until after the windows had been smashed in. [Doc. 28]. Mr. Gutierrez did not participate in the forceful breaching of the outer barricades, nor did he participate in the breaching of the inner doors or windows of the Capitol Building. He followed a set of rioters into the building, walked around with his flag in his hand through several rooms including the Hall of Columns, the Senate Wing, and the Crypt. He did not damage or steal any property while inside, and at no time did he assault or threaten law enforcement. After exiting the building, he remained on the building grounds and exchanged pleasantries with Capitol Police.

This conduct, while unlawful, was not borne of a desire to cause injury or destruction. It was borne of a sincere belief in what the January 6 Committee—tasked with investigating the events—called "The Big Lie." Before January 6, 2021, Trump encouraged millions of ordinary Americans to travel to D.C. to attend the "Stop the Steal" rally, where he would further encourage them to head to the Capitol building to protest the certification of the Electoral College Vote. Trump summoned his supporters to travel to D.C. based on claims that the 2020 Presidential election was stolen from him.[3] This proclamation was told over and over to his supporters beginning immediately after the 2020 election results where Trump even falsely

[3] Shivaram, Deepa, *The House Jan. 6 committee releases its final report on the Capitol attack*, NPR, December 22, 2022, available at https://www.npr.org/2022/12/21/1144489935/january-6-committee-full-report-release (last visited August 6, 2024).

declared victory.[4] Trump convinced ordinary Americans that irregularities existed in the voting practices and that the fraud would be uncovered. He held rallies all over the country, repeating these claims and firing up his base of followers.

When Trump invited millions of his supporters to travel to D.C. on the same day as the electoral certification, he gave them false hope that their voices could somehow change the electoral certification results and that they could encourage then-Vice President Mike Pence and other Republican leaders to reject the votes from states that had claimed voter fraud.

And so, on the morning of January 6, 2021, the sitting President of the United States spoke at the Ellipse in Washington D.C., and his words reflected what he had said on social media and at rallies, and what had been repeated over and over by partisan media sources on television. The supporters who were present that day heard that their country was under attack and that it was patriotic to be where they were, protesting to save the country from certain demise.

Below are examples of some of Trump's political rhetoric prior to January 6, 2021:

- A great report by Peter. Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild! – **Tweet on December 19, 2020**.[5]
- The Justice Department and the FBI have done nothing about the 2020 Presidential Election Voter Fraud, the biggest SCAM in our nation's history, despite overwhelming

[4] *Id*. at page 36 of final report.

[5] Sherman, Amy, *A Timeline of what Trump said before Jan. 6 Capitol riot*, Politifact, The Poyner Institute, January 11, 2021, available at https://www.politifact.com/article/2021/jan/11/timeline-what-trump-said-jan-6-capitol-riot/ (last visited August 7, 2024).

evidence. They should be ashamed. History will remember. Never give up. See everyone in D.C. on January 6th. – **Tweet on December 26, 2020**.[6]

- "The BIG Protest Rally in Washington, D.C., will take place at 11.00 A.M. on January 6th. Locational details to follow. StopTheSteal!" **Tweet on January 1, 2021**.[7]
- If you are planning to attend peaceful protests in D.C. on the 6th, I recommend wearing a body camera. The more video angles of that day the better. – **Retweet on January 3, 2021**.[8]
- If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect and even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back! – **Tweet from 1:00 a.m. on January 6, 2021.**[9]

Below are examples of some of the things that Trump supporters, like Mr. Gutierrez, heard Trump say, after several minutes of reiterating his claims that the election was stolen, on the morning of January 6, 2021:

- It's just a great honor to have this kind of crowd and to be before you and hundreds of thousands of American patriots who are committed to the honesty of our elections and the integrity of our glorious republic.[10]
- We're gathered together in the heart of our nation's capital for one very, very basic and simple reason – ***to save our democracy***.[11]

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *January 6 Report* at 61.
[10] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://apnews.com/article/election-2020-joe-biden-donald-trump-capitol-siege-media-e79eb5164613d6718e9f4502eb471f27# (last viewed on August 7, 2024).

- Now, it is up to Congress to confront this egregious assault on our democracy. And after this, ***we're going to walk down, and I'll be there with you***, we're going to walk down.[12]

- I know that everyone here will soon be marching over to the Capitol building to ***peacefully and patriotically*** make your voices heard.[13]

- And they want to recertify their votes . . . But the only way that can happen is if Mike Pence agrees to send it back. . . . If not . . . you will have an illegitimate President. That's what you'll have. And we can't let that happen . . . We must stop the steal and then we must ensure that such outrageous election fraud never happens again.[14]

- So we're going to, we're going to walk down Pennsylvania Avenue . . . And we're going to the Capitol, and **we're going to try and give them the kind of pride and boldness that they need to take back our country . . . So let's walk down Pennsylvania Ave**.[15]

- Today, ***for the sake of our democracy, for the sake of our Constitution, and for the sake of our children***, we lay out the case for the entire world to hear. You want to hear it?[16]

It was then that Mr. Gutierrez and countless others who believed themselves to be patriots, moved from the Ellipse down Pennsylvania Avenue to the Capitol Building.

---

[11] *Id*. (emphasis added).
[12] *Id*. (emphasis added).
[13] *Id*. (emphasis added).
[14] *Id*.
[15] *Id*. (emphasis added).
[16] *Id*. (emphasis added). This can also be heard clearly on Mr. Gutierrez's go-pro footage from his time at the Ellipse listening to Trump's speech.

**VI. Similar cases and sentences**

Under 18 U.S.C. § 3553(a)(6), the court must seek "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Given the number of defendants charged with misdemeanor offenses arising from their entry into the Capitol on January 6, 2021, there exists an ever-growing number of defendants whose conduct mirrors that of Mr. Gutierrez which the Court may use as a reference. The circumstances of each defendant, of course, are unique, but it is difficult to distinguish Mr. Gutierrez's conduct from other cases where no term of incarceration was imposed.

Mr. Gutierrez's conduct falls toward the mitigated, low-end of the spectrum of individuals who have been prosecuted. He is among those who unlawfully entered the Capitol but did not engage in aggravating conduct while present at the Capitol; he merits the imposition of a term of probation along with restrictive mandatory and discretionary conditions, but not a term of incarceration. Dozens of cases arising from the January 6 riot have resulted in probation rather than a custodial sentence, including those who were convicted of 40 U.S.C. § 5104(e)(2)(D) and/or § 5104(e)(2)(G).[17] In some of these examples, this Court determined it

[17] *See*, *e.g.*, *United States v. Saer*, 22-cr-374-DLF (36 months of probation); *United States v. Campanella*, 23-cr-231-ACR (12 months); *United States v. Cantrell*, 22-cr-121-TNM (3 months); *United States v. Pooler*, 24-cr-075-TNM (12 months); *United States v. Von Keudell*, 23-cr-221-CRC (24 months); *United States v. Tyner*, 23-cr-361-RDM (36 months); *United States v. Curl*, 23-cr-253-JDB (24 months); *United States v. O'Brien*, 24-cr-206-TNM (24 months); *United States v. Smither*, 24-cr-015-JMC (12 months); *United States v. Sylvester*, 24-cr-102-JEB (12 months); *United States v. Barber*, 23-cr-409-DLF (24 months); *United States v. Holmes*, 24-cr-090-TNM (12 months); *United States v. Cronin*, 22-cr-233-ABJ (18 months); *United States v. Tew*, 22-cr-027-RMM (24 months); *United States v. Horn*, 21-cr-301-TJK (12 months); *United States v. Cramer*, 23-cr-414-DLF (24 months); *United States v. Keen*, 23-cr-060-JMC (18 months); *United States v. Morgan-Lloyd*, 21-cr-00164 (36 months); *United States v. Ehrke*, 21-cr-00097 (36 months); *United States v. Hiles*, 21-cr-00155 (24 months); *United States v. Doyle*, 21-cr-00324 (60 days); *United States v. Rosa*, 21-cr-00068 (12 months); *United States v. Gallagher*, 21-00041 (24 months); *United States v. Vinson*, et al., 21-cr-0355 (5 years each); *United States v. Sanders*, 21-cr-00384 (36 months); *United States v. Cordon*, 21-cr-00269 (60

appropriate to reject jail sentences recommended by the government in favor of these probationary sentences.

A few cases in which other Capitol-breach defendants pleaded guilty to a violation of either 40 U.S.C. § 5104(e)(2)(G), or, like Mr. Gutierrez, both subsections (e)(2)(G) and (e)(2)(D), provide helpful points of comparison to place Mr. Gutierrez's conduct in context. As demonstrated below, many defendants, especially early on, pled only to subsection (e)(2)(G) and not (e)(2)(D), despite having similar or worse conduct that those, like Mr. Gutierrez, who pled to both. Accordingly, their conduct is instructive when considering Mr. Gutierrez's conduct. Examples are detailed below.

In *United States v. Rosa*, the Government sought a sentence of one month of home confinement after a plea to parading. *Se* 1:21-cr-68-TNM, Doc. 66. Mr. Rosa posted on social media about the day's events and acknowledged hearing bangs and smelling pepper spray in the air, an admission that the situation was escalating. He remained inside the Capitol for approximately 20 minutes, but there was no evidence he participated in any violence or destruction. *Id*. Ultimately, the Court sentenced Mr. Rosa to twelve months of probation, along with $500 restitution and $10 special assessment. *Id*. at Doc. 79.

In *United States v. Doyle*, this Court sentenced the defendant to two months of probation and a $3,000 fine, $500 in restitution, and a $10 special assessment. Ms. Doyle entered the

days); *United States v. Wilkerson*, 21-cr-00302 (36 months); *United States v. Wrigley*, 21-cr-00042 (18 months); *United States v. Parks*, 21-cr-00363 (24 months); *United States v. Nelson*, et. al., 21-cr-00344 (24 months each); *United States v. Mariotto*, 21-cr-00094 (36 months); *United States v. Edwards*, 21-cr-00366 (12 months), *United States v. Wangler et. al*., 21-cr-00365 (24 months each); *United States v. Hatley*, 21-cr-0098 (36 months); *United States v. Sizer*, 22-cr-0376-JEB (12 months); *United States v. Pert*, 21-cr-139-TNM (24 months); *United States v. Schwemmer*, 21-cr-364-DLF (24 months); *United States v. Witcher*, 21-cr-235-RC (12 months); *United States v. McAlanis*, 21-cr-516 (24 months); *United States v. Schubert*, 21-cr-588 (18 months). This list is non-exhaustive.

Capitol through a broken window, remained inside for 24 minutes, and appeared to be chanting and yelling in the direction of law enforcement. 1:21-cr-324-TNM at Docs. 27, 34.

In *United States v. Nelson et al.*, 1:21-CR-00344-JDB, the Court granted probationary sentences to both defendants who were convicted of 40 U.S.C. § 5104(e)(2)(G). In that case, the Court sentenced Abram Marfoski and Brandon Nelson to probation. After the offense, they gloated to one another about their participation in the riot and stayed in the Capitol building for over an hour.

William Blauser was convicted of 40 U.S.C. § 5104(e)(2)(G) and was sentenced only to a $500 fine, in addition to restitution. *United States v. Blauser*, et. al., 1:21-cr-00386-TNM, Doc. 108. Blauser "pushed through" officers to enter the Capitol and was "involved in a brief skirmish with law enforcement," "resisting" the officers, according to the Government. He exited 38 minutes after entering the Capitol.

Danielle Doyle was convicted of 40 U.S.C. § 5104(e)(2)(G) and sentenced to 2 months of probation and a $3,000 fine, in addition to restitution. *United States v. Doyle*, 1:21-cr-00269-TNM, Doc. 34. Ms. Doyle entered the Capitol Building through a broken window, then traversed multiple floors of the Capitol, before exiting 25 minutes later.

Sean Cordon was convicted of 40 U.S.C. § 5104(e) (2)(G) and was sentenced to 2 months of probation and a $4,000 fine, in addition to restitution. *United States v. Cordon*, et. al., 1:21-cr-00269-TNM, Doc. 37. He entered through a broken window, walked around, and then exited 4 minutes later using the same broken window.

William Cotton spent 20 minutes inside the Capitol building, during which time he chanted "traitor" along with the crowd. He was sentenced under 40 U.S.C. § 5104(e)(2)(G) to

nine months of probation and 60 hours of community service, as well as restitution. *United States v. Cotton*, *et. al*., 1:23-CR-00002-JEB, Doc. 35.

Louis Michael Ciampi, Jr. was found guilty of unlawful parading in the Capitol after he climbed through a broken window to enter the Capitol (after being cautioned by a friend not to), went to a sensitive place within the Capitol, and smoked a marijuana joint in a senator's office. *United States v. Ciampi*, 1:23-cr-00259-TJK, Doc. 16. He remained in the Capitol for a total of 40 minutes. *Id*. Mr. Ciampi was sentenced to a period of 18 months of probation with the special conditions of 60 hours of community service and 60 days of location monitoring. *Id*. at Doc. 18.

Conversely, in cases where individuals convicted of the same or similar statutory violations were sentenced to incarceration (including home confinement), the underlying offense conduct usually involved factors not present in this case: defendants who came prepared for a violent confrontation, encouraged others to be violent, actually committed violence, made aggravated social media posts, damaged property, or obstructed the investigation. There are several distinctions between Mr. Gutierrez's conduct and that of other individuals who were sentenced to incarceration. Examples are detailed below.

Nathan Entrekin was convicted of 40 U.S.C. § 5104(e)(2)(G). *United States v. Nathan Entrekin*, 1:21-CR-686-FYP. Mr. Entrekin re-entered the Capitol after being forced out by police officers. This confrontation with police, and then a continued assault on the Capitol distinguishes Mr. Entrekin from this Mr. Gutierrez. Further, Mr. Entrekin had two prior criminal convictions. Mr. Entrekin was encouraging other rioters in their advance on the Capitol. Mr. Entrekin entered into Senator Merkley's office. He was sentenced to forty-five days in jail; the Government recommended more than twice that amount.

Donald Pearston was sentenced to 10 days of incarceration, nine months of probation, a $1,000 fine and $500 restitution for 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). *United States v. Donald Pearston*, 1:23-cr-0454-JEB, Doc. 33. Mr. Pearston did not immediately leave when ordered to do so, faced officers giving that lawful order, and proceeded to make physical motions in their direction until he was forced out of the area. *Id*. at Doc. 22.

Angel Villanueva was sentenced to four months of home detention, 24 months of probation, and $500 restitution for 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). *United States v. Angel Villanueva*, 1:24-cr-016-TNM, Doc. 15. He entered the Capitol Building and went to multiple rooms where active riots were taking place. After Mr. Villanueva had left the building but was still on the Capitol grounds, he saw a group of rioters pushing against and assaulting officers with wooden boards. Mr. Villanueva ran in to join the crowd that was engaged with police officers, actively pushing with the other rioters against police officers. *Id*. at Doc. 13

Dawn Bancroft recorded a video where she states that she "did [her] part" when she "broke into the Capitol," "got inside," and was "looking for [Speaker of the House] Nancy [Pelosi] to shoot her in the frickin' brain." *United States v. Dawn Bancroft*, 1:21-CR-125-EGS. This comment was referred to by the Government as "among the most graphic statements uttered by any rioter on Capitol grounds that day." *Id*., Doc. 55, p. 14. Ms. Bancroft received a sixty-day jail sentence.

In this case, Mr. Gutierrez did not engage in violence. He was cooperative with the FBI when they interviewed him. He admitted his conduct and provided them incriminating evidence in an attempt to take full responsibility for his actions. After he was formally charged, Mr. Gutierrez took responsibility for his conduct by pleading guilty. Although Mr. Gutierrez posted videos of himself and others inside the Capitol immediately after the protest,

Mr. Gutierrez provided no provocative commentary; in fact, he posted the videos with no caption at all. His intent when he posted the videos was to show that, at least where he was in the Capitol, both the protestors and law enforcement were acting without violence. His online rhetoric was far less incendiary than that of others who have been granted probation.

Probation without any incarceration is a reasonable sentence that is consistent with other sentences of similarly situated defendants.

## VII. Probation is a reasonable sentence

Mr. Gutierrez's sentence recommendation is not without an appropriate amount of punishment. The Supreme Court has observed that probation is itself a meaningful punishment. *Gall v. United States*, 552 U.S. 38, 48-49 (2007). Offenders are subject to standard conditions that substantially restrict their liberty. See *United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987))). Moreover, probationers may not leave the judicial district, change their housing, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of crimes, and refrain from many activities that could present a risk of re-offense. Probation is a meaningful punishment that addresses concerns relating to public safety and assures that the probationer remains on-track with education and/or employment.

Deterrence encompasses two goals: general deterrence—the need to deter crime generally, and specific deterrence—the need to protect the public from further crimes by

Mr. Gutierrez. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). Deterrence, both specific and general, has already been accomplished.

The sheer number of individuals who have been very publicly prosecuted as a result of the events of January 6, along with the outcomes of those cases, provides the full measure of general deterrence necessary arising from the events of that day. Because there has been no repeat of the kind of violent or disruptive conduct that took place that day, despite Trump's entreaties to the contrary, it appears as if the general deterrence called for by the statute has succeeded.

In similar cases, the government has argued that deterrence is an important aspect of the sentence imposed. Given Mr. Gutierrez's history and characteristics, specific deterrence does not require a period of incarceration. As for deterrence and just punishment, a term of incarceration (rather than a term of probation) will have no more specific deterrent effect on him.

Mr. Gutierrez has been convicted of committing a crime, and this mark will remain on his record as navigates through life for many years to come. The actual criminal conviction is itself a strong punishment, which is why the government would not allow dispositions without adjudications in January 6 cases. Mr. Gutierrez has faced the shame that comes with disappointing his family. Some of the humiliation associated with being rebuked for his actions took place publicly, on his social media posts, and others privately, as his parents describe in their letters. [Exhibits D, E]. No additional specific deterrence is merited here. Mr. Gutierrez's conduct was mitigated. And when he was contacted by the FBI, he cooperated with investigators, acknowledged his misconduct, and accepted responsibility. He freely provided his go-pro footage in full and answered the FBI's questions truthfully.

His arrest, booking, and appearance in court; his significant time on pretrial supervision; and his potential time on probation are sufficient to make the point that his misconduct was criminal. For someone whose only prior illegal conduct was one speeding ticket, the arrest made a significant impression.

Moreover, Mr. Gutierrez has been on pre-trial release for eleven months without incident. [*See*, *e.g.,* Doc. 22, Pretrial Compliance Report]. His Pretrial Services Officer, Anthony Perez, has communicated to undersigned counsel on more than one occasion that Mr. Gutierrez is one of the most communicative and rule-following people he has ever supervised. Mr. Perez has never had to worry about knowing Mr. Gutierrez's whereabouts, and has never had cause for concern over his activities. There can be no better way to demonstrate that Mr. Gutierrez is more than capable of complying with whatever probation conditions are imposed upon him. And if that were not enough, he has more than half a dozen people in his corner willing and able to do everything in their power to make sure he remains in compliance with the terms and conditions of probation. His family is eager to reciprocate a lifetime of assistance should Mr. Gutierrez need anything from any of them. [*See* Exhibits A-F].

Ultimately, Mr. Gutierrez has moved on from the political discourse that brought him to the Capitol that day, and has no intention of repeating his conduct, which he quickly came to regret. He has a stable and lucrative job that he finds fulfilling. His boss and his family make up a strong support system who will work to ensure that he stays on the right path in the future.

/ /

/ /

/ /

## VIII. Conclusion

For the reasons set forth above, Mr. Gutierrez respectfully requests that this Court sentence him to a term of 12 months of probation, a fine of $1500, and $500 restitution.

Respectfully submitted,
HEATHER E. WILLIAMS
FEDERAL DEFENDER

DATED: August 7, 2024

By: */s/ Kara R. Ottervanger*
KARA R. OTTERVANGER
Assistant Federal Defender
Attorney for Christopher Gutierrez